[Crim. No. 245. Third Appellate District.—June 10, 1914.]

# THE PEOPLE, Respondent, v. FRED HOOSIER, Appellant.

CRIMINAL LAW—RAPE—FEMALE UNDER AGE OF CONSENT—SUFFICIENCY OF EVIDENCE TO SUPPORT CONVICTION.—In this prosecution for rape upon a female about eleven years of age, the evidence is sufficient to support a verdict of guilty, notwithstanding inconsistencies and contradictions in the testimony of the prosecutrix, and disagreement between her testimony and that of the defendant's accomplice.

ID.—CONFLICTING EVIDENCE—DISAGREEMENT BETWEEN WITNESSES ON SAME SIDE—REVIEW ON APPEAL.—Where two witnesses introduced by the same side disagree, even upon important points of a controversy, the effect thereof. is to produce a conflict in the evidence, and the conclusion of the jury thereon is as conclusive upon the courts of review as if the conflict had been produced by the testimony of two witnesses, introduced the one by one side and the other by the opposing side of the controversy.

ID.—ACCOMPLICE TESTIMONY—WEIGHT AND CREDIBILITY.—An accomplice is not to be disbelieved merely because he was an accomplice in the crime charged against the defendant. If there is other evidence which measures up to the requirement of section 1111 of the Penal Code, tending to connect the defendant with the commission of the crime charged, then the testimony of the accomplice is to be considered by the jury as is any other testimony and given such weight as they may conclude that it is entitled to.

ID.—DEFENSE OF ALIBI—CONFLICTING EVIDENCE—APPEAL.—Where the defense of *alibi* is interposed in a rape case and there is a sharp conflict in the evidence on that issue, the decision of the jury against the defendant is binding upon the appellate court.

ID.—TESTIMONY OF PHYSICIAN WHO HAD EXAMINED PROSECUTRIX—WHETHER INCONSISTENT WITH HER TESTIMONY.—In this prosecution for rape upon a female about eleven years of age the testimony of a physician who made an examination of the sexual organs of the prosecutrix some eight or nine months after the alleged commission of the offense is not, considered in its entirety, necessarily inconsistent with the testimony of the prosecutrix.

ID.—CONFESSION OF DEFENDANT IN JAIL—WHETHER VOLUNTARY.—The confession of the defendant in this case, made while a prisoner in the county jail to the sheriff, was voluntary and admissible in evidence against him.

ID.—TIME OF COMMISSION OF CRIME—ALLEGATION AND PROOF.—The failure of the district attorney to show that the crime charged was

committed at the precise time fixed in the information is not fatal
to the integrity of the verdict.

ID.—INFORMATION—TIME OF FILING—EVIDENCE AS TO DATE OF CRIME.—
The rule that an information filed within the statutory period of
time the lapse of which before the filing of the same would have
barred a prosecution of the charge, is sufficient to support a verdict
in criminal cases in which time is not of the essence of the charge,
even where the time has been definitely fixed in the information and
the evidence is not clear and definite as to the exact date of the
crime, is applicable to a rape case.

ID.—TESTIMONY OF PROSECUTRIX AND ACCOMPLICE OF DEFENDANT—IN-
STRUCTION REQUIRING JURY TO SCRUTINIZE.—An instruction to the
jury in a rape case to carefully scrutinize and scan the testimony
of the prosecutrix and an accomplice of the defendant would in-
volve an invasion of the constitutional province of the jury to
determine for themselves the weight and effect of evidence.

ID.—ALIBI—BURDEN OF PROOF—REASONABLE DOUBT—INSTRUCTIONS.—
Instructions are erroneous which assume that an *alibi*, like insanity,
is a special defense, the proof of which by a preponderance of the
evidence upon that issue is a burden resting upon the defendant.
If the testimony addressed to the *alibi* is sufficient to raise a
reasonable doubt of the defendant's presence at the scene of the
crime at the time it was committed, then a reasonable doubt of his
guilt arises, and he is entitled to an acquittal.

ID.—TESTIMONY OF ACCUSED—INSTRUCTION DISCREDITING—HARMLESS
ERROR.—An instruction in a rape case that in weighing the evidence
of the defendant it is proper for the jury to consider whether his
position and interest may not affect his credibility and color his
testimony is erroneous, but in view of the strong and convincing
proof of guilt its giving did not result in a miscarriage of justice
in the present case.

APPEAL from a judgment of the Superior Court of Del
Norte County and from an order refusing a new trial.   John
L. Childs, Judge.

The facts are stated in the opinion of the court.

W. A. Wood, E. M. Frost, and Henry L. Ford, for Appel-
lant.

U. S. Webb, Attorney-General, and J. Charles Jones, Dep-
uty Attorney-General, for Respondent.

HART, J.—The defendant was convicted of the crime of
statutory rape upon one May Bartol, a female of the age of

about eleven years, and brings the case to this court on an appeal from the judgment and the order denying him a new trial.

This case contains the final chapters of the story of a veritable saturnalia of lechery which was carried on, during the month of February, 1913, at Crescent City, Del Norte County. The initial chapter of the series of malodorous transactions is given in the case of the *People* v. *Bartol,* (Crim. No. 244,) *ante,* p. 659, [142 Pac. 510], the opinion in which was filed in this court on June 1, 1914. From the beginning to the end, the story is replete with details which are revolting in the extreme and shockingly illustrate the degree of perverseness to which human nature can descend. Indeed, so monstrously diabolical are the circumstances of the series of transactions leading to this and the Bartol cases that justly it may be declared that truly they have discovered and so added to the criminal annals of California proof of the very *ultima thule* of human depravity. It is, indeed, a heavy tax on human credulity to believe that anywhere within the zone of civilized society a mother could so far descend into the depths of depravity as to suffer herself to assist in forcing her daughter, even where the latter is of the age of consent and of judgment matured to some extent, to submit to acts of sexual intercourse with the opposite sex, and infinitely more difficult is it to conceive, and even much more to believe, that a mother would coerce her eleven-year old child, a mere infant, to submit to such monstrous acts of immorality. Yet, such is the story told in the Bartol case, and which story was found by the jury who heard it to be true.

The child upon whom the outrage was committed in the Bartol case is the same child upon whom the defendant in this case was charged with and convicted of perpetrating a similar outrage.

It was on or about the eighth day of February, 1913, at a cottage situated in the suburbs of Crescent City, that Ruby E. Bartol, the defendant in the other case referred to, forced her daughter, May Bartol, then eleven years of age, to submit to an act of sexual intercourse with one Orville Taggart.

According to the record before us, a few nights after said act by Taggart, May Bartol was similarly outraged, at her mother's home, by said Taggart, one Otto Creitzer, and the defendant.

The story, as told by the little girl, and as corroborated by Otto Creitzer and by the confession of the defendant himself, is briefly as follows: That, on or about the twelfth day of February, 1913, the defendant, Taggart, and Creitzer visited the Bartol home shortly after nightfall. There was also present at the house at the time a divorced woman by the name of Josie Horn. A short while after the defendant arrived at the house, Mrs. Bartol, mother of May, left her home, accompanied by a brother of Otto Creitzer, for the purpose of visiting a neighbor, to whom she had previously sold a cow, and collecting some money due her on that transaction. Besides the parties above named, there remained at the house the prosecutrix and three other children of the Bartol woman, each younger than May. Mrs. Bartol and her husband, it seems, had previously separated and were then not living together.

After Mrs. Bartol's departure, as above explained, the defendant, Creitzer and Taggart each (one immediately after the other) had intercourse with the said Josie Horn. These acts took place in the house and were carried on with such reckless indifference that the little girl either actually witnessed them or, from the circumstances, could not but know that they were taking place. In fact, Creitzer testified that the child threatened to make a disclosure of the whole nasty transaction, and, in the hope that its consummation would prevent the child from carrying out the threat, the horrible idea was conceived and suggested by Josie Horn that the young men have sexual relations with May. This proposition, bestial as it was, was readily assented to by the three men, and thereupon Josie Horn, assisted by the defendant, forcibly threw the little girl upon a bed and raised up her clothes. Creitzer was the first to have connection with the child. He was immediately followed by Taggart and the latter by the defendant. While these acts were being perpetrated, Mrs. Horn held the child down, and, after it was all over, addressed the victim of the infamy as follows: "Now, I guess you haven't got anything on me. You wouldn't like to tell your father or Mr. Cousins that this was done to you. If you tell him that, I will tell on you."

Not many days after the outrageous occurrences above related, May Bartol went to the home of her grandfather, in

Oregon, and only a short time thereafter, whether, in mere childish innocence, having no appreciation of the infamy fastened· upon her character before she had hardly reached the threshold of her life, or whether from a keen consciousness of the enormity of the wrong committed upon her, divulged to a girl companion, of approximately her own age, some of the details of the shocking licentiousness occurring at her mother's home during the month of the preceding February, and to which she was an unwilling party. Thus the particulars of the terrible crimes of the defendant, his male companions and the Bartol and Horn women, finally reached the ears of the authorities of Del Norte County, who immediately instituted a searching investigation, with the result that the culprits were brought before the bar of justice. As already shown, Mrs. Bartol, the mother of the child victim of the outrages, was tried and convicted, Creitzer pleaded guilty, and the defendant, upon a trial before a jury, adjudged guilty, as before stated.

The first point to which attention is directed and which constitutes one of the grounds upon which a reversal is asked is that the evidence does not support the verdict. The above statement of the facts which were brought out at the trial is sufficient to demonstrate that there is no merit to this proposition. The jury were, as is universally understood, the exclusive judges of the credibility of all the witnesses, and if, as this verdict implies that they did, they believed the testimony given by the witnesses called by the people to support the charge in the information, then this court can justly say that the evidence is conclusive of the defendant's guilt. The testimony of the prosecutrix is not unreasonable upon its face. It does not, so far as we are able to pass judgment upon it, involve the narration of an improbable story, unless it may be announced to be true, as an abstract proposition, that no civilized human can be found so foul and depraved as to commit acts of such heinousness as those which constitute the subject-matter of her testimony, and this we cannot say. She apparently told her story in a straightforward manner, hesitating at times, it is true, but only because, we have the right to assume from her immature years and innate female modesty, of the extremely embarrassing situation by which she was surrounded—compelled, as she was, to relate, in the presence of

the court, the jury, lawyers and spectators, the shameful cir-
cumstances of as flagitious an affair as ever received an airing
in a court of justice.  She was not shown to have any reason
or motive for wrongfully charging the defendant with so
eggregious a crime, and, while there are some apparent incon-
sistencies in her testimony and it was also made to appear
that the several statements she made concerning the affair
were not harmonious in all particulars, still, as a whole, her
story appears to be reasonable and is clearly one which it was
within the legal right of the jury to believe, if convinced that
it was truthful.  In other words, her testimony was of such
character as that it became peculiarly a function of the jury
to decide whether, notwithstanding the inconsistencies and
contradictions pointed out therein, her story was, in the main,
entitled to such credit and weight as to persuade the convic-
tion that the defendant was guilty.

But much is made of the fact that, in certain respects, the
testimony of the defendant's accomplice, Creitzer, and that of
the child do not agree.  In some minor particulars, the testi-
mony of the said witnesses varied, but, obviously, this was a
matter entirely for the jury's consideration and decision.
Where two witnesses introduced by the same side disagree
even upon important points of a controversy, the effect thereof
is to produce a conflict in the evidence, and in such case the
conclusion of the jury upon such conflict is as conclusive upon
the courts of review as if the conflict had been produced by
the testimony of two witnesses, introduced the one by one
side and the other by the opposing side of the controversy.
If, therefore, Creitzer, who was a witness for the people, con-
tradicted the prosecutrix even upon important and vital mat-
ters of fact, it was for the jury to determine which of the two
was to be believed as to those matters, and their decision
thereon is the end of the proposition.  But it is to be re-
marked that as a matter of fact, on all important points,
Creitzer corroborated the prosecutrix, the points of divergence
in their testimony merely involving, as stated, matters of no
special significance, such, for instance, as the position of the
child on the bed when she was outraged, whether sidewise or
lengthwise of the bed.

Nor were the jury compelled to entirely repudiate the testi-
mony of Creitzer merely because he was an accomplice in the

crime committed by the defendant, as is the contention. The law, as a matter of policy, based upon the probability that the guilty, to relieve themselves to some extent from the consequences of their crimes, may be tempted to bear false witness against the innocent, has wisely provided that no conviction can be sustained on the testimony of an accomplice, "unless he is corroborated by other evidence which in itself, and without the aid of the testimony of the accomplice, tends to connect the defendant with the commission of the offense," and that "the corroboration is not sufficient, if it merely shows the commission of the offense, or the circumstances thereof." (Pen. Code, sec. 1111.) But this does not mean that an accomplice may not be believed. If there is other evidence which measures up to the requirement of said section tending to connect the defendant with the commission of the crime charged, then the testimony of the accomplice is to be considered by the jury as is any other testimony and given such weight as they may conclude that it is entitled to.

The defendant attempted to establish an *alibi* by the presentation of evidence tending to show that, on the evening of the day upon which the offense is charged by the information to have been committed, and on several evenings thereabouts, he, as well as Josie Horn and Orville Taggart, were at places other than the Bartol house. It is argued here that the testimony thus produced made it impossible for the testimony given by the prosecutrix and Otto Creitzer to be true, and it appears to be the position of counsel for the defendant that it is within the province of this court so to hold. Of course, this position follows from the palpably erroneous assumption that it is within the power and the duty of this court to pass upon the credibility of witnesses and to determine the weight to be accorded their testimony. It may be conceded that there is an irreconcilable conflict between the testimony produced by the people and that produced by the defendant, and that the one or the other is necessarily false. This necessarily follows, of course, from the fact, common to all criminal cases, where the charge is denied and the questions of fact are contested, that the two sides proceed upon entirely different and diametrically opposite theories. With singular propriety, therefore, has the constitution not only committed to the jury the exclusive province of deciding the questions of fact in all

cases, but has declared that their decision of those questions shall be final or, as questions of fact, not subject to review by the courts of appeal. A better illustration of the wisdom of this rule than in the present case could hardly be found. The testimony was in sharp conflict, and, as before suggested, one or the other of the two sets of opposing witnesses were either mistaken or told untruths. Who could be in a better situation to determine this all-important question than the jury or the court in whose presence the testimony was given? They heard and saw all the witnesses as they testified and observed and noted the manner in which they answered the direct and cross questions, and thus were enabled to consider, compare, and weigh, with at least approximate accuracy, all the evidence and so reach a just conclusion upon the facts. Evidently the jury regarded the testimony addressed to the *alibi* theory as not worthy of their belief, and there is nothing in the record which tends to show that their repudiation of that theory was the result of an arbitrary consideration thereof or of the testimony offered in its support. Hence, their decision of that issue is binding upon us.

It is vigorously contended, however, that the testimony of Dr. Fine, a physician, conclusively shows that the child had never been subjected to such treatment as she declared that she had received at the hands of the defendant and his male companions. Some eight or nine months after the outrages were perpetrated, Dr. Fine, at the request of the sheriff and under an order of the court, made an examination of the sexual organs of the prosecutrix. He testified, on direct examination, that he discovered the existence of no unusual conditions in the private parts; that they appeared to be normal in all respects for a female of her age; that there were no indications of approaching puberty and he found only a rudimentary hymen, a condition not unusual to girls of the age of the prosecutrix. But, on cross-examination, he declared that it was possible. "for the privates of a man to have penetrated her private parts to the extent of an inch and a half or two inches eight or nine months ago and left no marks of identification at this time." (The little girl testified that the defendant penetrated her private parts with his privates to the extent of an inch and a half or two inches.) Apparently the testimony of Dr. Fine, considered in its entirety, is not neces-

sarily inconsistent with the child's story. The jury could consistently have believed the testimony of both. In other words, if, as the doctor said, it was possible that an act of that kind could be done and leave no physical traces thereof discernible nine months thereafter, the jury, without disbelieving other parts of the doctor's testimony, could have consistently believed, as obviously they did believe, the prosecutrix and Creitzer when they declared that the act was actually done.

The ruling whereby the confession of the defendant was admitted in evidence is assigned as erroneous and prejudicial. The objection interposed by the defendant to the allowance of the confession in evidence was on the general ground that the proper foundation for its admission had not been preliminarily laid. We assume that what counsel meant by this objection was that the alleged confession was not shown to have been the voluntary confession of the accused. We think the court was justified in overruling the objection and so admitting the confession. The defendant was a prisoner in the county jail and, therefore, in the custody of the sheriff, awaiting trial upon the charge set forth in the information, when the statement objected to was made. The sheriff testified that, "sometime after his arrest, Fred Hoosier sent for me. I had my deputy . . . bring him over to my office. He said that he wanted to make a statement or confession. . . . No one was present but I and Mr. Hoosier, in the first part of the time. Well, I said, wait here and I locked the door and I will go and see if the prosecuting attorney will stand for it. I saw Mr. Hersch"—the district attorney. The sheriff saw and talked with the district attorney regarding the proposition and then returned to his office and said to the defendant "that there is nothing doing." The sheriff then called into his office one Breen, tax-collector of Del Norte County, introduced him to Hoosier, saying: "This young fellow, Mr. Hoosier, wants to make a confession, and I informed Mr. Hoosier of his rights. I told Mr. Hoosier that any statement that he might make before me and Mr. Breen would be used against him. Well, he said he wanted to make a confession and relieve his mind. I told him all right, go ahead and do it, and he did." Breen's testimony as to what occurred after he was brought into the presence of the de-

fendant is substantially the same as the testimony of the sheriff.

The foregoing involves a statement of all that was shown, prior to the ruling admitting the confession in evidence, of the circumstances under which the statement to the sheriff and Breen was made by the accused.

We can perceive no sound reason for holding that the confession was not a voluntary one and freely given by the defendant. Before the court ruled on the admissibility of the confession, the uncontradicted testimony was that Hoosier of his own volition sent for the sheriff and stated that he desired to tell all he knew about the crime with which he was charged and his connection therewith. Before listening to Hoosier, the sheriff desired first to interview the district attorney and, having interviewed that official, was evidently told by him (we judge from what the sheriff said to Hoosier on his return, "that there is nothing doing") that he (the sheriff) would not be authorized to hold out to the accused, in consideration of a confession, any hope of leniency, as far as punishment was concerned. The defendant undoubtedly so understood the remark of the sheriff, for, after the latter had said to him, "there is nothing doing," and informed him that any statement that he might then make concerning his connection with the affair leading to the charge against him would be used against him at the trial of his case, the defendant said that "he wanted to make a confession and relieve his mind." If a statement under such circumstances is not a free and voluntary one, then it would be difficult to form a conception of such a statement. It is true that the sheriff and Breen do not expressly say that the prisoner was not threatened or promised some immunity and thus induced to tell his story, but it of necessity follows from the circumstances under which the confession was given, as detailed by the sheriff and Breen, that neither the sheriff nor Breen, for the purpose of forcing an admission of guilt from the defendant, made any threats or resorted to other acts of intimidation, or held out any hope of immunity or clemency to the prisoner. In other words, if the confession came about and was made as the sheriff and Breen describe, then there can be no reason for saying or supposing that it was either

given under duress or influenced by hope of immunity held out by those to whom he confessed.

The defendant, it is true, testified, in support of his denial of having carnal connection with May Bartol, that prior to making the statement above considered, the sheriff said to him that, if he contested the case, he would, if convicted of the crime, receive a life sentence, but that, if he would enter a plea of guilty, he would receive a less severe punishment; but this testimony was given after the confession was admitted into the record and it cannot, therefore, be considered as an element entering into the determination of the question whether the court, by receiving the confession as evidence, did or did not commit error. If the defendant, upon the preliminary issue involving the question of the admissibility of his confession, had thus given his version of the circumstances under which his statement was made to the sheriff, the court, as would have been its duty to do, would doubtless have considered it in reaching a conclusion upon that issue; and even in that case, the conclusion of the trial court upon the question would have concluded its review here under the rule applicable to conflicting evidence upon disputed questions of fact.

The contention that the failure of the district attorney to show that the crime charged was committed at the precise time fixed in the information is fatal to the integrity of the verdict possesses no merit. The argument is that, from the fact that the testimony does not, as is the claim, definitely fix the precise time as alleged, the defendant could not protect himself against a second prosecution and judgment for the same identical offense as the one charged here. But the circumstances of the crime are such as to clearly and definitely mark and identify it and so make his conviction thereof available as a plea of former conviction and once in jeopardy in case, after such conviction, an attempt should be made to proceed against him on precisely the same charge. The information was filed within the statutory period of time the lapse of which before the filing of the same would have barred a prosecution of the charge, and this has always been held sufficient in criminal cases, in which time is not of the essence of the charge, to support a verdict, even where the time has been definitely fixed in the information and the evi-

dence not clear and definite as to the exact date of the crime. We can see no reason why the rule should be applied with any more rigor or exactitude to cases of rape than to other criminal cases.

The remaining assignments involve attacks upon the action of the court in the matter of its charge to the jury.

It is said that the court seriously erred by failing to instruct the jury carefully to scrutinize and scan the testimony of the prosecutrix and Otto Creitzer and to warn them of the danger of a conviction on such testimony. In the first place, such an instruction would involve an invasion of the constitutional province of the jury to determine for themselves the weight and effect of evidence. Such an instruction has often been given in rape cases and just as often has the constitutional inhibition against instructions by trial courts upon questions of fact been ignored. If the trial judge entertains a doubt of the truthfulness of the testimony of the prosecutrix in a rape case serious enough to give such an instruction, and there is no other testimony supporting the charge, then he ought to take the case from the jury, lest, in such cases in particular, public sentiment in the community or the natural prejudices of men against crimes of that nature, may influence a verdict against the accused upon testimony of exceedingly doubtful verity. In the second place, the court was not requested to give any such instruction, and it is not conceived, even if the instruction were legally a proper one, that it rested upon the court to give the instruction upon its own motion or in the absence of a request for it.

The defendant severely arraigns the court for giving the following instructions:

"The defendant has offered evidence for the purpose to prove that at the time the alleged crime was committed he was not present, but on the contrary was at some other place at the time the alleged crime was committed. In other words tending to prove an *alibi,* and in that behalf you are instructed that when the defense offers evidence for the purpose of proving an *alibi,* the law does not require that degree of evidence to support that fact as is required to prove the guilt of the defendant; but it is sufficient if the defendant prove the *alibi* by the preponderance of evidence, and is not

required to prove the same to a moral certainty and beyond a reasonable doubt.

"I therefore charge you that if you believe from the evidence that at the time the said alleged crime was committed, the defendant was not present, then you are instructed that it is your duty to find the defendant not guilty.

"When a defendant, charged with a crime, produces evidence in support of an *alibi*, the law does not require that degree of proof as excludes the possibility of error, but only that degree of proof which produces conviction in an unprejudiced mind. And if the evidence presented by the defendant in this case is sufficient and does produce such a conviction in your mind, he is entitled to the benefit of such proof and if it is sufficient within itself to prove an *alibi* it is your duty to find the defendant not guilty."

Obviously, the foregoing instructions are erroneous. They assume that an *alibi*, like insanity, is a special defense, the proof of which by a preponderance of the evidence upon that issue was a burden resting upon the defendant, whereas, an *alibi* merely means or involves the negative of an element in the proof of the offense charged which it is essential for the people to establish beyond a reasonable doubt, to wit: that the accused was present at the scene of the crime at the time of its commission and that, therefore, the opportunity for its commission by him was present. In other words, an *alibi* means that the defendant was elsewhere than at the place where the crime charged was committed at the time of its commission and that, therefore, he could not have committed it. And the rule is that, if the testimony addressed to the *alibi* is sufficient to raise a reasonable doubt of the defendant's presence at the scene of the crime at the time it was committed, then a reasonable doubt of his guilt arises, and he is entitled to an acquittal.

But the defendant is in no position to complain of the action of the court for the giving of said instructions, for the record shows that they were given and read to the jury by the court at his request. The same instructions, in exactly the same language, were given to the jury in the Bartol case on the motion of the defendant herself, and it is there said that "she cannot find fault with the court in complying with her request."

The following instruction is complained of: ''The testimony of an accomplice ought to be viewed with distrust, and in weighing the evidence of the defendant, it is proper for the jury to consider whether the position and interest of such defendant may not affect his credibility and color his testimony; but you are to weigh it fairly, in the light of all the surrounding circumstances, and give it such credit as you think it ought to receive.''

The part of the foregoing instruction to which the defendant objects reads: ''And in weighing the evidence of the defendant, it is proper for the jury to consider whether the position and interest of such defendant may not affect his credibility and color his testimony,'' etc.

A similar instruction, given in the case of the *People* v. *Bartol, ante,* p. 659 [142 Pac. 510], was condemned by the defendant as having prejudiced her rights in said case, and, as is said there so it is equally, of course, true here, that, while a similar instruction had been disapproved by the supreme court (*People* v. *Maughs,* 149 Cal. 262, [86 Pac. 187]), it cannot be said, in view of the strong and convincing proof of the defendant's guilt, the giving of it resulted in a miscarriage of justice. (Const., art. VI, sec. 4½; *People* v. *O'Bryan,* 165 Cal. 55, [130 Pac. 1042].)

We have now examined all the important points raised on this appeal, and, as is manifest, have discovered no just reason for disturbing the verdict.

The judgment and the order appealed from are, accordingly, affirmed.

Chipman, P. J., and Burnett, J., concurred.

A petition to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on August 8, 1914.