[Crim. No. 1765. Third Dist. Aug. 6, 1941.]

THE PEOPLE, Respondent, v. LYLE ROSS et al., Defendants; E. H. McAFEE et al., Appellants.

386

Glenn D. Newton and Daniel S. Carlton for Appellants.

Earl Warren, Attorney General, J. Q. Brown, Deputy Attorney General, L. W. Carr, District Attorney, and John A. Spann, Deputy District Attorney, for Respondent.

THE COURT.—The appellants were jointly indicted with one Lyle Ross by the grand jury of Shasta County in two counts for the crimes of conspiracy to commit grand theft and conspiracy to commit robbery. The charge of grand theft consisted of the stealing of an account book, checks and cash in excess of the sum of $200, belonging to International Hod Carriers and General Laborers Union of America, Local 961. Lyle Ross pleaded guilty to both counts of the indictment and became a witness at the trial against the appellants. The appellants were convicted of conspiracy to commit grand theft. They were acquitted of the charge of conspiracy to commit robbery.

It is contended the judgment is not supported by the evidence, chiefly because there is a lack of evidence sufficient to corroborate the testimony of the co-conspirator, Lyle Ross, as to the guilt of the defendants, as required by section 1111 of the Penal Code.

The International Hod Carriers Union, Local 961, maintained headquarters in the Empire Hotel building on California Street in Redding. Harold Generes was the financial secretary and treasurer. Richard C. Brennan was recording secretary. The appellant, E. H. McAfee, commonly called "Mike," was business agent. The other appellant, Willis McAfee, usually called "Bud," assisted his brother as business agent. A large number of laborers who worked in that vicinity were under the jurisdiction of that local organization. They paid their dues in cash or by means of checks, to either secretary Generes or to Mr. Brennan at the union office at Redding. The money and checks were temporarily placed in a cash box. The receipts and disbursements were entered in a cash book. The receipts which were paid on Wednesday and Friday of each week usually exceeded a thousand dollars. The money was deposited by either secretary every two or three days, depending upon the amount accumulated. When a considerable sum was received, without the opportunity to deposit it in the bank, Mr. Brennan often carried it home with him in an envelope to keep over night. Just prior to the date of the commission of the theft in question, it was also his custom to carry the cash book home with him at night. This was done because Mike McAfee, the business agent, had told him to "keep that book with him at all times," or at least to keep the book safely. Mike McAfee, whose duty it was to pay expenses to laborers during strikes, was often handed cash for that purpose from the daily receipts, which items were presumed to be entered in the cash book. The prosecution contended that the motive of Mike McAfee in directing the secretary to take the book with him, was to obtain possession of it by means of the planned theft, so as to prevent the directors of the union from discovering previous misappropriations of money. But the evidence fails to show a substantial shortage of cash prior to the theft in question. It seems fair to assume the record does not adequately support that theory regarding the book.

On the day of the theft, October 23, 1940, cash was paid into the office in the aggregate sum of $1,060. During that day secretary Generes either deposited a large part of the receipts or took with him, at seven o'clock, when he went home, about $800. When Mr. Brennan went home that night about 8 o'clock he had only a balance of $214 in cash and checks, which he took with him in an envelope, together with the cash book. The theory of the prosecution was that Mike McAfee did not anticipate that Mr. Generes would take with him or deposit a large portion of the receipts of the day, but, on the contrary, that Mr. Brennan was likely to carry with him the entire day's receipts.

The co-defendant, Lyle Ross, went to Redding the latter part of July, 1940, in search of a job. He was an ex-convict, on parole. He applied for work at the hall of Union Local Number 961. He there met Bud McAfee who was serving as business agent for the union during the temporary absence of his brother Mike. A local strike was then in progress. He had a conversation with Bud McAfee in front of the hall, in which Mr. Ross told him that he had been in trouble and that he was then on parole. Bud knew he had been convicted of several crimes. Ross had a very bad criminal record. Bud, however, told him there was no position available just then, but encouraged him to believe he might secure one later. Mr. Ross secured a job a few days later from a contractor by the name of J. P. Brennan, at Weed, about eighty miles from Redding. October 21st, he returned to Redding, and hunted up Bud McAfee, at the office of the union, and made an application to join the union. Bud told him he would talk with his brother Mike and get him "straightened out" with the union. Bud went with Ross and had a drink in an adjacent saloon. They then had a long conversation while they sat in Bud's automobile in front of the hall. Bud asked him about the nature of the trouble he had previously referred to. Ross told him it was with the federal government. After learning of Mr. Ross' criminal record, Bud finally asked him if he "could use some easy money." Ross testified at the trial that Bud told him that if he would carry out a plan they had in mind "there would be approximately two hundred dollars in it for me." He said Bud explained to him the manner and approximate amount of dues which were paid to the secretaries each week and recorded in the cash book, together with the habit of the

recording secretary, Richard C. Brennan, to leave the office about seven or eight o'clock in the evening, taking with him the cash book and the receipts of the day. He said they usually deposited the money in the bank Thursday and Saturday, and that they would usually have on hand about a thousand dollars. Bud told him they had been spending a lot of money on account of the strikes, a part of which they were not able to account for, and that they were afraid of letting the officers of the union get possession of the cash book. Bud told him they planned to carry out a "fake holdup" and get possession of the book and cash from the secretary when he carried them out with him the following Wednesday night. He told Ross that Brennan would leave the office between seven and eight o'clock with his brief case containing the book and money, as it was his custom to do, and after getting a lunch in Caso's restaurant near by, he would cross the street and enter his automobile. He told Ross that all necessary arrangements "would be fixed," and that he was to wait in front of the hall, and when Brennan got into his machine he "was to get into the car and ride out the Iron Mountain highway with him and bring the car and the satchel back." Bud then told him, "There will be possibly a thousand dollars in it, and that would have to be split four or five or possibly six ways." He again told Ross there would be about two hundred dollars as his share of the plunder. Ross was told that Mike McAfee, Richard Brennan and Harold Generes were involved in the conspiracy. After obtaining possession of the book and money, Ross was to leave Brennan in the country, park the car on a side street in Redding and deliver the brief case and its contents to Bud, who would be waiting for him at the liquor store near the old post office building.

Mr. Ross told Bud he would carry out the plan. After the conversation just related, by agreement Ross met Mike McAfee at the hall at 1:30 o'clock in the afternoon, and he arranged affairs so that Ross was duly admitted to membership in the union. He returned to work the following day.

Wednesday afternoon, October 23rd, according to their previous plan, Ross did not return to work, but took his station near the front entrance to the hall about seven o'clock in the evening. He had armed himself with a monkey wrench. It was then raining and dark. It appears that Bud's estimate of the amount of dues which would be collected that day was

very accurate. The total sum of $1,060 was actually collected. At 7:30 o'clock Harold Generes came out and drove away in his car. Generes took with him an envelope containing about $800 of the receipts of that day's payments, but Ross was unaware of that fact. Half an hour later, Brennan came out with his brief case in his hand. He went to Caso's restaurant near by where he spent about fifteen minutes eating lunch, after which he emerged, and, crossing the street to where his car was parked, he opened the door and threw his brief case in on the front seat. There were then no pedestrians in sight.

From this point in the story the testimony of Ross and of Brennan differ quite radically. Ross said that he was standing on the left hand side of the car, and that Brennan got in his car on the right hand side. Ross then opened the door and got in the rear seat. Brennan looked around at him without saying a word. Ross said "O. K., Dick, let's go." Brennan drove out of town on the Iron Mountain road a distance of four or five miles and, turning into a side road, stopped on the margin of the highway. Ross asked him if everything was all right. Brennan answered, "Yes, everything is in that satchel." He then got out of the machine and Ross drove the car back to town and parked it on a side street. He then opened the brief case and counted the money, discovering that there was only $81 in cash and about $130 in checks. He returned them to the case and, taking the portfolio, walked to the old post office building where he found Bud sitting in front of the liquor store. Ross delivered the brief case to him with the remark that there had been a mix-up somewhere. Bud then counted the contents of the envelope and said, "Well, there has been a mix-up some place. I will admit that but I don't know where it is at. . . . You take the money." Ross did so, and dropped it in his side pocket. Bud then added, "I will try to get this arranged around and see where the mix-up was so that you can get the rest of your money." Bud told Ross he would see that he got the rest of his money. Bud took the brief case with the cash book and checks, and they parted. Ross then told Bud he would go back to Weed where he had been previously working. He did so.

The story of Mr. Brennan regarding the actual holdup is quite different from that of Lyle Ross. He testified that prior to October 23rd, Mike McAfee advised him to keep

the cash book in his personal possession and that he thereafter usually carried it home with him at night; that about 7:30 p. m. on October 23rd, Mr. Generes left the office and took with him a large portion of the receipts of the day; that he left the office that night at eight o'clock, taking the balance of the cash and checks received that day, together with "this general cash book *that I carry,*" which he placed in his brief case, and that after eating a light lunch in Caso's restaurant, he crossed the street to his Plymouth sedan automobile, which was parked near Davis' garage, and started to get in on the left hand side when "someone poked a gun in my back and told me to get in and act natural and nothing would happen." He said that it was raining and dark and he did not see the individual. He was facing forward when the incident occurred. He did not see the gun, but assumed that the object which was shoved in his back was a revolver. He said he promptly obeyed the command and got into the front seat, and that the other man entered the back seat. He tried to turn around and look at the man but was told "not to turn around" or he would "get plugged." He followed a peremptory order to drive out of town along the Iron Mountain road for a few miles and thence on to a side road for a short distance. He was then told to stop the car and to turn it around, heading in the direction from which they had come. He did so. The man told him "You don't have to get nervous or get afraid; nothing will happen to you if you don't try anything." He was then told to get out and "march up in front of the car," which he did, after having been searched for a gun. He left his brief case on the front seat. When he attempted to look around, the man said, "Turn back around there if you don't want to get slugged." Ross then took the wheel and passing Brennan he disappeared toward Redding. Brennan said he did not know the man who robbed him. From a glimpse of him in the dark he could not accurately describe his appearance, but thought he was a young man of medium height and weight. He however said he believed he could recognize his voice if he heard it again. Mike McAfee admitted that he knew Mr. Brennan had said he could recognize the voice of the man who robbed him.

After the car was out of sight Mr. Brennan ran rapidly down the road and knocked at the door of the first farm

house he saw, which was owned by Mr. and Mrs. Apperson. It was then about 8:30 p. m. Both of them testified he was greatly excited; that he was wearing no hat, and that he was in "an awful hurry to get to town." He told them he had been "stuck up and robbed." It was then raining and dark. Mr. Apperson immediately got his car and took Brennan to Redding. At his request Mr. Brennan was taken directly to the state highway office opposite the city hall, when Brennan told them he had been held up and robbed. He told Mr. Meeker, the sheriff, he thought he could recognize the voice of the robber.

An investigation of the crime resulted in the arrest and joint indictment of Mike and Bud McAfee and Lyle Ross for conspiracy to commit grand theft and robbery. Mr. Brennan testified he never saw Lyle Ross from the night of the robbery until after his arrest on December 12th. At the request of the sheriff he went to the jail to see and talk with Ross, and he said "I recognized his voice." Mr. Ross pleaded guilty, and became a witness at the trial against the other defendants. They were convicted of conspiracy to commit grand theft, and they were acquitted of the other charge of conspiracy to commit robbery.

■ We are of the opinion the record contains sufficient evidence to connect the appellants with the commission of the offense of conspiracy to commit grand theft. It adequately corroborates the testimony of the accomplice, Lyle Ross, as required by section 1111 of the Penal Code. Numerous circumstances leave little doubt that the appellants were implicated in the crime. These corroborating circumstances consist of the following facts:

The appellants were business agents of Local Union 961; they met Lyle Ross in July prior to the larceny, and were informed he had been convicted of crimes and that he was then on probation; they knew of his criminal record; they had knowledge of and informed Ross of the approximate amount of dues which were collected from members of the union each Wednesday and Friday; they told Ross there would be about $1,000 collected on Wednesday, October 23rd. Ross had no other means of learning that fact; the sum of $1,060 was actually collected that day; they told Ross it was the custom of Brennan to take the receipts of the day and the cash book home with him at night. He

had no other way of learning that fact. Neither the cash book nor the stolen checks were recovered. The appellants knew Ross personally, having met and conversed with him several times; they knew his name, the hotel where he stopped in Redding, his description and the place and nature of his employment. Mike McAfee admitted they were suspicious he was the man who committed the theft, yet they failed to disclose his identity to the officers. They also knew that Mr. Brennan had said he thought he could recognize the voice of the man who robbed him, yet they made no effort to bring him in contact with the man they believed committed the crime. In spite of their knowledge of the criminal record of Mr. Ross, they arranged to restore his membership in the union. After the commission of the crime, Mike McAfee procured the issuance to Ross, on October 31st, of a union card appointing him as ''shop steward.'' After the investigation of the crime had proceeded several weeks, just prior to the arrest, Bud, at the request of Mike, wrote a note to Ross, leaving it at his hotel for delivery, in which he said, ''Meet me out at Mike's house at 11 o'clock.'' A postscript added the statement, ''It's important so be sure and be there.'' The note was received in evidence. Its authorship is not disputed. December 11th, the day before the arrest, Mike McAfee telephoned to Ross at Weed, asking him for a conference, and immediately drove up to see him. Mike claimed to have gone to Weed to interview Ross about organizing a local labor union at that place. He said he did not then think of his participation in the robbery, although he admitted that he was always suspicious of his guilt. He brought Ross back to Redding with him. On the way back he told Ross he expected to go into a bonding business with a man by the name of Needham. He told Ross that Needham carried on his person $3,000 in cash and a certified check for $4,000. Ross claimed Mike tried to persuade him to rob Needham. Ross did not know Needham, yet he did actually have knowledge that he carried the money and check on his person. That information must have been conveyed to Ross by Mike, for Needham testified that he carried the money and check on his person, and that no one knew of that fact except Mike and his wife to whom he previously showed the money in a hotel at San Francisco a few days prior to December 11th.

The foregoing circumstances adequately furnish corroboration of the connection of the appellants with the crime, independently of the testimony of the accomplice, Ross.

The discrepancy between the testimony of Lyle Ross and Mr. Brennan does not necessarily mean that the latter was implicated in the crime. It is immaterial, so far as the guilt of the appellants is concerned, whether he was or not. There are sufficient circumstances to connect the appellants with the crime independently of the testimony of either Lyle Ross or Mr. Brennan.

It is contended the record conclusively shows that Mr. Brennan was an accomplice in the conspiracy, and that his evidence must therefore be disregarded. We think not. In the absence of evidence clearly showing that a witness is an accomplice in the perpetration of a crime for which another person is being tried, we may not so assume for the first time on appeal and arbitrarily exclude his testimony. In the present case we find no indication that, during the trial, the appellants regarded Mr. Brennan as an accomplice. There was no objection to his testimony on that ground. The appellants offered no instruction to the jury advising them they should consider his testimony with caution if they believed him to be an accomplice. The jury was fully instructed upon that general principle of law with an evident application to the testimony of Lyle Ross alone. It was a question for the jury to determine whether Mr. Brennan was an accomplice. In the absence of clear and undisputed evidence to that effect, we may not assume for the first time on appeal that he was an accomplice and therefore exclude his testimony from consideration under the provisions of section 1111 of the Penal Code.

In the case of *People* v. *Coffey*, 161 Cal. 433 [119 Pac. 901, 39 L. R. A. (N. S.) 704], it is said, regarding the duty of a jury to determine whether a witness is or is not an accomplice, that:

"When the question of an accomplice arises in the trial of a case, the general and accepted rule is for the court to instruct the jury touching the law of accomplices, and leave the question whether or not the witness be an accomplice for the decision of the jury as a matter of fact. (*People* v. *Kraker*, 72 Cal. 459 [1 Am. St. Rep. 65, 14 Pac. 196].)"

See, also, *People* v. *King*, 30 Cal. App. (2d) 185 [85 Pac. (2d) 928], at page 197, for a statement of the same principle.

It is true that one who is charged with conspiracy to commit a crime may be convicted upon the testimony of an accomplice, under section 1111 of the Penal Code, only when corroborating facts or circumstances are shown, independently and without the aid of the testimony of the accomplice, tending substantially to connect the defendant with the commission of the offense. (Penal Code, sec. 1111; *People* v. *Compton*, 123 Cal. 403, 411 [56 Pac. 44]; 5 Cal. Jur. 515, sec. 19; 15 C. J. S. 1156, sec. 93b.) The corroborating evidence is not sufficient when it merely raises a suspicion of the guilt of the defendant. The corroborating testimony may consist of either direct or circumstantial evidence which tends to connect the accused person with the offense charged. The relationship of the parties and their acts and conduct are competent evidence to be considered. (*Johnstone* v. *Morris*, 210 Cal. 580, 590 [292 Pac. 970]; *People* v. *Wiley*, 33 Cal. App. (2d) 424 [91 Pac. (2d) 907]; *People* v. *Nikolich*, 93 Cal. App. 356 [269 Pac. 721]; 5 Cal. Jur. 521, sec. 24; 15 C. J. S. 1146, sec. 93a.) In the text last cited it is said in that regard:

"To establish sufficiently the existence of the conspiracy, proof of an express agreement is not necessary, and direct evidence is not essential, but the conspiracy may be sufficiently shown by circumstantial evidence and the conduct of the parties."

In proof of an alleged conspiracy to commit a crime, the credibility of witnesses and the weight and sufficiency of the evidence, are matters for the determination of the jury. (5 Cal. Jur. 519, sec. 23.)

It is true that some of the acts of the appellants relied upon as proof that they were implicated in the alleged conspiracy occurred after the money and property had been stolen. That evidence was, however, competent for the reason that the conspiracy in the present case included not only the stealing of the money and the cash book from Mr. Brennan, but also a division of the money between the conspirators and the payment of a specified sum of about $200 to Lyle Ross for perpetrating the crime. Bud McAfee told Ross they would have to divide the stolen money between

five persons. He told Ross his share would be about $200. After the larceny had been committed and they secured only $81 in cash and about $130 in checks, Ross was given the cash with a promise that they would see that he got the remainder of the amount which he was promised. That promised balance was never paid to Ross. It is the theory of the prosecution that the appellants subsequently procured his appointment as steward of the local union to conciliate him until they could pay him the balance of his reward for executing the crime. It is also suggested the subsequent effort to procure Ross to rob Carl Needham was to carry out their promise to see that Ross got $200 for the first theft, and that the note which was written to Ross to meet Bud at the home of Mike, and Mike's trip to Weed were all a part of the same transaction to steal and divide the money taken from Mr. Brennan. Those acts were all matters for the determination of the jury. It has been held that when a conspiracy discloses an agreement and intention to divide the stolen property, as it does in the present case, evidence of the acts, conduct and declarations of the conspirators subsequent to the actual theft, may be admitted in evidence on the theory that the conspiracy is not completed until the spoils are divided. (*People* v. *Dean*, 66 Cal. App. 602, 608 [226 Pac. 943]; *People* v. *Fay*, 82 Cal. App. 62 [255 Pac. 239]; 8 Cal. Jur. 124, sec. 212.) In the Fay case evidence of the subsequent effort to sell certain bonds was held to be competent in a criminal charge of conspiracy to steal the bonds. In the authority last above cited it is said in that regard:

''When a conspiracy discloses an intention to divide property stolen, evidence of acts and declarations at any time before the division are admitted upon the theory the conspiracy does not end until that time.''

Likewise, acts performed subsequent to a theft, which is the object of a conspiracy, in compliance with a promise to pay an accessory a specified sum for his participation in the crime, are also competent as tending to prove the conspiracy.

▉ It does not appear that Lyle Ross was promised immunity or leniency as a reward for testifying against the appellants. The record merely shows that he pleaded guilty to the offenses jointly charged against him and the defendants, and that he became a witness for the prosecution. The

jury was informed that Ross was an accessory to the crime and that he had pleaded guilty. They were properly instructed regarding the evidence of an accomplice and that they must view his testimony with caution on that account. They were also properly instructed that they could disregard the testimony of any witness who had been impeached. The jury knew that Ross had been impeached under the provisions of section 2051 of the Code of Civil Procedure by evidence that he had been previously convicted of a felony. The jury therefore knew they had a right to reject his testimony entirely. They were duly cautioned in that regard. It is true that his testimony under such circumstances should be examined with great care and that the question of his credibility was subject to grave suspicion. (22 C. J. S. 1381, sec. 805.) But the questions of his credibility and of the weight to be given to his testimony were to be determined solely by the jury. In 22 C. J. S. at page 1381, sec. 805, it is said in that regard:

"An accomplice is not rendered incompetent as a witness by the mere fact that he has been promised immunity from prosecution, or mitigation of his punishment. . . . The fact that a witness hopes or expects that he will secure a mitigation of his own punishment by testifying on behalf of the prosecution does not disqualify him."

At page 1383 of the same text it is further said:

"The fact that a person is an accomplice in the commission of a crime goes to his credibility as a witness, and to the weight of his testimony. . . .

"In considering the effect of the testimony of an accomplice and the weight to which it is entitled, the courts have made numerous statements indicating the questionable character of such testimony, as, for examples, that it is not regarded with favor, that it is discredited by the law, that it should be received and viewed or acted on with caution, that it should be weighed with care in the light of the circumstances, that it should be scrutinized closely, carefully, or cautiously."

 While the jury may disregard the testimony of an accomplice or a witness who has been impeached, they are not necessarily required to do so, unless it is wholly disbelieved. The witness is nevertheless competent and his evi-

dence is entitled to such weight as the jury believes it should be accorded. In the case of *People* v. *Negra,* 208 Cal. 64 [280 Pac. 354], the court said:

"While the jury may consider the circumstances that a witness is an accomplice, in passing upon his credibility as a witness (*People* v. *Clough,* 73 Cal. 348, 354 [15 Pac. 5]) his testimony is not to be rejected merely because he is an accomplice, and if there is other evidence which measures up to the requirement of the code (*supra*), tending to connect the defendant with the commission of the crime charged, then such testimony of the accomplice is to be considered by the jury, *as is any other testimony,* and must be given the weight to which the jurors may consider that it is entitled. (*People* v. *Hoosier,* 24 Cal. App. 746 [142 Pac. 514].)"

In 16 Corpus Juris 695, section 1422, it is said:

"As a general rule the credibility of an accomplice and the weight to be accorded to his testimony are questions for the jury as in the case of other witnesses."

The same rule applies to a witness who is charged with a crime jointly with other defendants, and who has either been separately tried and convicted of the crime, or who pleads guilty thereto.

We may not say that the testimony of Lyle Ross, in the present case, is inherently improbable.

For the foregoing reasons we are of the opinion we may not interfere with the verdict of the jury.

The judgment and the order are affirmed.

Appellants' petition for a hearing by the Supreme Court was denied September 3, 1941. Carter, J., voted for a hearing.