[Crim. No. 15541.   Second Dist., Div. One.   May 13, 1969.]

THE PEOPLE, Plaintiff and Respondent, v. CHARLES MARTIN HARRIS, Defendant and Appellant.

Ronald J. Stauber, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and Frederick R. Millar, Jr., Deputy Attorney General, for Plaintiff and Respondent.

FOURT, J.—This is an appeal from a judgment of conviction of attempted robbery and of simple assault (a misdemeanor).

In an information filed in Los Angeles on November 16, 1967, defendant was charged in count 1 with assault with intent to commit murder (§ 217, Pen. Code) and in count 2 with attempting to rob York Wallace. Defendant pleaded not guilty and in a jury trial defendant was found guilty of simple assault, a lesser included offense, as to count 1 (§ 240, Pen. Code) and guilty as charged as to count 2 (§ 664, Pen. Code). Probation was denied and defendant was sentenced to the state prison for the term prescribed by law as to count 2 and to the county jail for 180 days as to count 1; the sentence as to count 1 was stayed pending any appeal as to the count 2 charge and further stayed if the judgment as to count 2 be affirmed. A timely notice of appeal was filed.

A résumé of some of the facts is as follows: at about 2 a.m. on October 26, 1967, York Wallace parked his automobile under a street light in front of his house at 2032 East 120th Street in Los Angeles. He started to take from his car some groceries which he had just purchased and as he did so he felt

an object in his back and turned around to see what was taking place. The defendant with a revolver in his hand and pointed at Wallace's head announced to Wallace, "This is a holdup. Be quiet." In a loud voice Wallace responded, "Oh, Lord." Defendant said to Wallace, "I told you to be quiet" —hesitated momentarily and then with the gun only inches away from Wallace's head fired the gun and shot Wallace in the face. Wallace fell to the pavement face down, then started to get up on his knees when defendant struck him on the side of his head and shoulder with the gun. Wallace attempted to get up and defendant struck him again. Wallace called out and his daughter (Mrs. McClendon) who lived in the house came outside and saw the situation with reference to her father. She shouted to the defendant to get away from her father. Defendant then ran to his 1957 black and white De-Soto automobile which was parked a short distance from the Wallace car. Defendant tried to start his car and had some difficulty at first in making it go.

Mrs. McClendon saw that defendant was about to get away and she ran inside the house just momentarily and shouted to her mother, "Dad has been shot." Mrs. McClendon ran out, got into her car and accompanied by a neighbor, John Caraway, gave chase to defendant. The defendant's car was within sight (about a half block away) at the time Mrs. McClendon started to follow him. Defendant drove to a Shell service station about a mile from the scene of the crime. The defendant was driving the De Soto car and it was in sight during all of the chase. At the Shell station defendant got out of his car and went to the lube rack area where he stood. Mrs. McClendon got out of her car, walked up to the window of the station and took a good look at defendant. Defendant at that time appeared to be shocked and he stared at Mrs. McClendon. She wrote down on a piece of paper the license number of the De Soto car, returned to the home and called the police giving them the license number and location of the De Soto car and a description of defendant. The officers arrived shortly and arrested defendant. A search was made for the gun which defendant had used, but none was found.

Defendant testified that he was just driving down the street and a strange woman hailed him and asked him to take her to the area where the offense was committed; that the woman had gotten out of his car and had gone into a house and he was just there waiting for her to return as she had requested; further, that he saw a man approach the Wallace car, saw the

man put the gun to Wallace's head and then fire a shot, that he then saw the man beat Wallace with the gun; further that he, defendant, became frightened, left the area and drove to the Shell service station where he intended to call for help for Wallace; that the reason he appeared frightened when Mrs. McClendon drove up was that he thought the man with her was going to shoot him.

By way of rebuttal the prosecution called a deputy sheriff who testified that at about 2:30 a.m. he had talked with defendant after fully advising defendant of all of his constitutional rights and defendant had told the officer a different story about what had occurred on the night in question with reference to the strange woman who was supposedly being chauffeured by defendant. Various residents of the area also testified that no such person as described by defendant had been in their houses during the time in question.

Appellant now asserts that the identification was insufficient; that the court should have given an alibi instruction on its own motion upon the basis of the supposed mistaken identity; that the testimony exculpating him was improperly impeached; that he did not have any constitutional warning with reference to the conversations which were used for impeachment purposes; and that he was inadequately represented in that the public defender failed to exercise reasoned and considered judgment.

Appellant first complains of instructions (CALJIC Nos. 21 and 22 (Revised)) which were given on the court's own motion and without objection. CALJIC No. 21 is taken from section 1096 of the Penal Code, and section 1096a of the Penal Code. Penal Code section 1096 provides:

"A defendant in a criminal action is presumed to be innocent until the contrary is proved, and in case of a reasonable doubt whether his guilt is satisfactorily shown, he is entitled to an acquittal, but the effect of this presumption is only to place upon the state the burden of proving him guilty beyond a reasonable doubt. Reasonable doubt is defined as follows: 'It is not a mere possible doubt; because everything relating to human affairs, and depending on moral evidence, is open to some possible or imaginary doubt. It is that state of the case, which, after the entire comparison and consideration of all the evidence, leaves the minds of jurors in that condition that they cannot say they feel an abiding conviction, to a moral certainty, of the truth of the charge.''

Penal Code section 1096a provides:

"In charging a jury, the court may read to the jury section

1096 of this code, and no further instruction on the subject of the presumption of innocence or defining reasonable doubt need be given.'' We have no intention of opening up any Pandora's Box or of loosening the fabric of Penal Code section 1096. In *People* v. *Simms,* 144 Cal.App.2d 189, 199 [300 P.2d 898], it is appropriately stated: ''The court gave an instruction on reasonable doubt which departed from the established formula. (Pen. Code, § 1096.) Without determining whether the instruction correctly stated the law we refer to *People* v. *Castro,* 68 Cal.App.2d 491, 497 [157 P.2d 25], where the court said: 'Trial courts have been repeatedly admonished to follow . . . the language of section 1096. Failure to do so is simply inviting error.' It was to eliminate such claims of error as here made that the legislature enacted Penal Code, section 1096a.''

An excellent example of what may occur when a trial judge attempts to formulate his own instructions on the subject matter here under consideration is set forth in *People* v. *Morris,* 260 Cal.App.2d 848, 849 [67 Cal.Rptr. 566], where the court said: ''In instructing the jury, the trial judge did not use the standard jury instructions found in CALJIC. Rather, he formulated his own instructions, and it is apparent from their text, considered as a whole, that he sought to couch them in language more meaningful and familiar to the layman than that used in the form book. The purpose is commendable, but as prior cases show, the peril is great. [Citations.]

''Appellant requested the court to read CALJIC 21 to the jury. This instruction is an exact quotation of Penal Code section 1096. It begins by informing the jury of the presumption of innocence that stands in favor of every defendant accused of a crime and states that the effect of the presumption is to require the state to prove guilt beyond reasonable doubt. It then defines reasonable doubt in words long accepted as a proper definition of that term. [Citations.] But the trial judge rejected appellant's request and used his own instruction, elaborating upon the definition of reasonable doubt in terms he believed more comprehensible to the layman than the terms of the statute. Unfortunately, however, the judge at no time told the jury that appellant was presumed innocent until the contrary was proved, or that the burden of proof beyond a reasonable doubt rested upon the People. This, appellant contends, deprived him of a fundamental right. We agree.''

As to the identification of appellant as being the robber and assailant, it is difficult to imagine how there could be

any more convincing evidence that appellant was the criminal involved. The evidence of identification is overwhelming. Wallace correctly described appellant to the officers and after he was released from the hospital with no difficulty at all he picked appellant's picture out of a group of pictures as being the photograph of the man who had attempted to rob him. With reference to the matter of identification the jury was fully and fairly instructed.

As to the alibi instruction none was requested and the claim of any prejudice or error because such an instruction was not given comes too late. In any event even had an instruction been requested under the circumstances it should have been refused. (See *Matter of Application of Shoemaker*, 25 Cal.App. 551, 561 [144 P. 985] ; *People* v. *Hoosier*, 24 Cal. App. 746, 758 [142 P. 514] ; CALJIC 31.1 instruction.) Defendant's defense was not that he was not there at the scene but that it was another person who shot Wallace, not he.

As to the impeachment testimony it is clear that before appellant talked to the officers and told them his story at about 2:30 a.m. he was thoroughly advised of his constitutional rights. It is obvious from the record that when in court appellant testified to one set of supposed circumstances—he had told the officers a different story and the officer to whom appellant had talked was properly called to testify as to what appellant had told him on the night shortly after the crime had been committed. Furthermore, there was no objection to the testimony of the officer. This is not a case of the prosecution's withholding a confession and then introducing it by way of rebuttal—the appellant's statements were exculpatory in nature and until appellant testified, such statements as made to the officer were useless to the prosecution.

Appellant cites several so-called instances of incompetency of counsel at the trial. Appellant made no suggestion of a complaint about the competency of his lawyer until after he was convicted, and counsel was appointed in this court. The public defender creditably represented appellant, and the appellant's complaints about his trial counsel are entirely unsupported by the record.

The judgment is affirmed.

Wood, P. J., and Lillie, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied July 9, 1969.