[Crim. No. 4677. Second Dist., Div. Two. Dec. 12, 1952.]

THE PEOPLE, Respondent, v. MILTON S. FRANKFORT et al., Appellants.

Sidney Traxler for Appellants.

Edmund G. Brown, Attorney General, Frank Richards, Deputy Attorney General, S. Ernest Roll, District Attorney, Jere J. Sullivan, and Logan Lindley, Deputy District Attorneys, for Respondent.

FOX, J.—Defendants Frankfort and Nudelman were convicted, by the court sitting without a jury, of 68 counts of grand theft and one count of conspiracy to commit grand theft, and were sentenced to the penitentiary. They appeal from the judgment and the order denying their motion for a new trial.*

This prosecution arose out of defendants' participation in a club and subdivision project in which various individuals were induced to invest their money through fraudulent repre-

---

*The intricate transactions and operations here under review cover 5,000 pages of reporter's transcript. There are 600 exhibits, and the briefs total 750 pages.

sentations allegedly made by them. The sales scheme developed on a step by step basis. The modus operandi was as follows: First, potential buyers were offered an associate membership in a country club, then a charter membership, and finally a conversion membership, each of which was sold at progressively higher prices. These were followed by building-lot sales, and collection of maintenance fees. The sales inducements varied from time to time. Initially, the lure was a gift lot, then an equity bond, and finally a lot-purchase discount proposition. Out of these operations defendants collected some $450,000.

In the summer of 1945 defendant Frankfort purchased the property and facilities here involved, which were located at Lake Elsinore, California. Defendant Nudelman became associated with him. A considerable portion of the property had been previously owned by the Clevelin Realty Corporation, which had for a number of years carried on a subdivision program and had sought to develop both a country club and a beach club, and had accordingly sold a great many memberships throughout Southern California. The Clevelin Realty Corporation went defunct and the holder of the trust deed became the owner of the property through foreclosure. In acquiring the property Frankfort arranged to get a list of all former holders of membership privileges in the Clevelin Realty organization. In December, 1945, defendants Frankfort and Nudelman (together with a third party who some months later disposed of his interest to them) organized the Spa Corporation, which took over these properties. The parties had already created the Spa Country Club, which was a fictitious name. It become the property of the Spa Corporation. These defendants then embarked on a campaign to sell memberships and lots. To that end a sale organization was recruited. Sales meetings were held by Frankfort, who also gave individual instructions. He prepared the forms, literature and brochures that were used in making the sales.

The first membership drive was for associate members at a rather nominal annual fee. The former members of the Clevelin Realty Corporation as well as the public generally were circularized and solicited. Between 5,000 and 6,000 such memberships were sold. The purpose of this membership was not alone to obtain the fees involved but the opportunity to get people acquainted with the club at a cheap

price and then sell them a charter membership or a conversion membership and ultimately a building lot.

The charter memberships were offered to the former members of the Clevelin Realty group and to the associate members. The price varied from time to time but ranged from $225 to $435. This class of membership provided for a gift to each member by the Spa Corporation of a piece of unimproved real property situated some 2½ or 3 miles from the clubhouse. All of these charter memberships had a promissory note attached which varied in amount from $270 to $360, which was payable on either an annual or semiannual basis over a 10-year period. This was said to be for maintenance. Each member was required to sign the note as a part of the membership purchase. The gift deed could be used in the acquisition of a building site in the improved section. In 1947, upon the demand of the Real Estate Division, the use of the gift deed was discontinued. Defendants offered in its place, in connection with the sale of charter memberships, an equity bond which had a value of $750 when applied toward the purchase of a building site. The use of this equity bond was, however, soon discontinued at the request of the Real Estate Division.

Early in 1948 defendants discontinued the sale of charter memberships and in their place offered a conversion membership to all associate and Clevelin members. The price of this membership was $615 plus a $360 maintenance fee, payable in semiannual installments over a 10-year period. With this conversion membership defendants offered a discount agreement by which a member could buy property from the corporation at a reduced price. Defendants continued to sell this class of membership until September, 1948, when their operations were closed down.

As a part of this project defendants formed the Spa Hot Springs Corporation. The avowed purpose of this corporation was to develop a hot springs, mineral bath and health resort at the Spa Country Club to be run in connection with the activities of the country club.

■ Defendants contend that Count I (conspiracy) fails to state a public offense. They point out that a false representation is a necessary element of the crime of obtaining money by false pretenses. They then proceed to analyze the allegations of the conspiracy count and reach the conclusion that no false representations are in fact alleged; that the

allegations are mere matters of opinion, or are promissory in character, or relate to collateral rather than material matters. Their analysis, however, is not sound. Only a few references to these allegations need be made to demonstrate their error. It is alleged, for example, that defendants falsely and fraudulently represented that with the purchase of each charter membership there would be given a parcel of land to be exchanged for a lot in a selected rental area upon which a cottage would be constructed and furnished; also, that the Spa Corporation and the Spa Hot Springs Corporation would construct a large sanitarium and bath facilities near Lake Elsinore and had developed a source of mineral water to be piped to such sanitarium and bath facilities; and that the maintenance fee was for the upkeep of the cottages and that the government agencies and lending institutions required payment of such fees in advance of construction. It is clear that the foregoing charges relate to material and not merely collateral matters, and that they are not in the realm of opinion. If it be said that some of these and other allegations in the conspiracy count are of a promissory character the answer is that it is alleged that the defendants conspired to obtain money by false pretenses and by false promises with fraudulent intent not to perform such promises. The charge here is in the language of Penal Code, section 182(4), and since the amendment of section 952, Penal Code, in 1927 such a pleading is sufficient to state a public offense. (*People* v. *Chait,* 69 Cal. App.2d 503, 513 [159 P.2d 445] ; *People* v. *Gordon,* 71 Cal. App.2d 606, 610 [163 P.2d 110].)

Defendants contend that the evidence is insufficient to sustain their conviction on the conspiracy count. ■ The gist of a criminal conspiracy is a corrupt agreement of two or more persons to commit an offense prohibited by statute, accompanied by some overt act in furtherance of the objects of the agreement. (Pen. Code, §§ 182, 184; *People* v. *Brownstein,* 109 Cal.App.2d 891, 892 [241 P.2d 1056] ; *People* v. *Pierce,* 110 Cal.App.2d 598, 610 [243 P.2d 585].) ■ The existence of the conspiracy may be established by circumstantial evidence. (*People* v. *Steccone,* 36 Cal.2d 234, 237-238 [223 P.2d 17].) ■ The agreement may be inferred from the acts and conduct of the defendants in mutually carrying out a common purpose in violation of the statute. (*People* v. *Benenato,* 77 Cal.App.2d 350, 358 [175 P.2d 296] ; *People* v. *Brownstein, supra.*) ■ It is not

necessary that the overt acts be criminal. (*People* v. *Gordon, supra,* p. 628.) If such acts are done as a step toward the furtherance of the conspiracy they are sufficient. (*People* v. *Gilbert,* 26 Cal.App.2d 1, 23 [78 P.2d 770].) Also the overt act may be performed by any one of the conspirators and yet be sufficient, for the members of the conspiracy are bound by all acts of all members done in furtherance of the agreed plot. (*People* v. *Creeks,* 170 Cal. 368, 374 [149 P. 821]; *People* v. *Pierce, supra.*) Finally, once the conspiracy is established all evidence of the substantive crimes becomes admissible against all participants, even though the other conspirators were not present. (*People* v. *Temple,* 15 Cal.App.2d 336, 339 [59 P.2d 417]; *People* v. *Gordon, supra.*)

It should also be borne in mind in passing on the sufficiency of the evidence to sustain a conviction that, before a reversal may be had, it must be made clearly to appear that upon no hypothesis whatever is there sufficient substantial evidence to support the conclusion reached in the court below. (*People* v. *Newland,* 15 Cal.2d 678, 681 [104 P.2d 778].) We must assume in support of the judgment the existence of every fact which the trial court could have reasonably deduced from the evidence, and then determine whether the facts "justify the inference of guilt." (*People* v. *Deysher,* 2 Cal.2d 141, 149 [40 P.2d 259].) If the circumstances reasonably justify the determination of the trier of fact, the opinion of the reviewing court that those circumstances might also reasonably be reconciled with the innocence of the defendant will not warrant a reversal. (*People* v. *Newland, supra; People* v. *Gould,* 111 Cal.App.2d 1 [243 P.2d 809].) Applying these principles it is clear that the trial court was amply warranted in drawing the inference that an agreement and plan existed between the defendants to cheat and defraud by false representations and fraudulent promises.

In buying this property Frankfort arranged to acquire a list of former members in the defunct Clevelin Realty organization. Defendants then started operating under the fictitious name of the Spa Country Club. These operations, however, appear to have been carried on through the Spa Corporation upon its organization. Defendants conceived the plan and developed the technique by which memberships in this country club would be sold and how such sales

would be used as a means of selling lots in their subdivision. Their first approach was to the Clevelin Realty group. It was at first by mail, but with slight success. This was followed by salesmen whom the defendants had employed, trained and equipped. Defendants developed a sales talk for their agents, to the effect that by reason of their former membership in the Clevelin setup they owned certain rights for which the Spa Corporation must give them something or get their release. Defendants also developed the story for their salesmen that the old Clevelin Corporation had sold memberships without having a roster of 100 members who owned property, and that, to fill up that roster, the right had been given to such persons to receive a piece of property in the income area of the club; that by reason of death and resignations there were vacancies that carried these rights which they were now offering the Clevelin membership. This was false because the Clevelin Realty Corporation never had any roster of charter members, lots were sold to anyone who wanted to buy, and membership was issued to all who bought lots. It did not give the member the right to purchase any particular property.

Defendants conceived the membership plans to be offered to former Clevelin members and to their own associate members. They instructed their salesmen that with every such membership the member would receive a gift lot in the residential area which could be exchanged for a lot in the rental area provided the member would have a house built for rental purposes which the Spa Corporation would finance. These statements were false. The member could not exchange the gift lot for one in the rental area and the Spa Corporation could not finance the construction of the cottages.

As to the collection of maintenance fees, defendants instructed their representatives to tell the members that the corporation desired to undertake a building program but because of the maintenance fee they could not deliver a clear title for the reason that this fee was considered a lien and therefore prevented their getting finances; that if the member was to be one of the first 25 to own a cottage, such member must pay the maintenance fee; that if the member did not pay such fee he would have to sign a release. The collectors were told by defendants that the money collected from the maintenance fees was going into a fund for the perpetuation of the club and care of the cottages. This line of "sales talk" appears to have been simply another tech-

nique for the purpose of extracting more money from the members. No separate maintenance fund appears to have been established; nor was there any reasonable basis for saying that the maintenance fee notes created a lien.

As a further step in their scheme defendants organized the Spa Hot Springs Corporation. They represented to their salesmen that a large sanitarium and bath facilities would be constructed near the lake, and that they had developed a source of thermal mineral water to be piped to such facilities. The statement relative to the development of a source of mineral water was not true as shown by their own engineer's report.

It was stated by defendants that the corporation had spent over $1,000,000 in piping the hot water from the spring to the bathhouse; also, that the properties were being financed by a syndicate in New York having plenty of money. These representations were not true.

Approximately $450,000 was realized from the sale of memberships and lots. Of this amount about $70,000 went into the property and improvements during their three years of operations, and something like $160,000 was divided between Frankfort and Nudelman.

While the foregoing summary shows defendants' pattern of operation it does not include numerous variations in their sales campaigns and many details in their sales talks.

In view of the close, cooperative, and apparently harmonious manner in which Frankfort and Nudelman worked together in this venture for some three years, the development by them of one sales scheme after another, and the unison of their efforts in instructing and equipping their salesmen, the trial court could reasonably draw the inference that they were operating with a common understanding. and pursuant to an agreement between them. The evidence clearly supports the implied finding that defendants, in accordance with their mutual understanding, made false and fraudulent representations with respect to material matters, as, for example, the exchange of the gift lot for a building site in the rental area, financing, mineral water supply, and maintenance fees.

The court was justified in drawing the inference that such representations were made with the intent to deceive and defraud in view of the fact that only about 15 per cent of the money derived from the sale of memberships and lots went into the development of the project and that for every

dollar that was actually so used approximately $2.25 found its way into the pockets of defendants. These facts also justify the inference that the statements of defendants that they planned to build a large sanitarium and health resort, which would undoubtedly have cost a substantial amount, were fraudulent. A multitude of overt acts were committed in furtherance of this corrupt agreement, among them being some 46 contacts by defendant Nudelman and the other salesmen with the victims of the defendants' scheme.

In arguing that the evidence is not sufficient to support their conviction on the conspiracy count defendants attack the testimony of certain of the salesmen charging it is full of conflicts, inconsistences and lies, and also attack the credibility of the victims who corroborated the testimony of the salesmen. ■ It was, of course, for the trial court to pass upon the credibility of the witnesses, resolve the conflicts and inconsistencies in the testimony, and determine the weight to which it is entitled. (*Dillard* v. *McKnight,* 34 Cal.2d 209, 223 [209 P.2d 387, 11 A.L.R.2d 835].)

Defendants argue that the conviction on the conspiracy count cannot be sustained because it is based on the testimony of the salesmen who were accomplices and that there is no sufficient corroboration as required by section 1111, Penal Code. In reaching this conclusion defendants overlook a number of significant facts and circumstances.

■ The corroborating evidence is sufficient if it connects the defendant with the commission of the crime in such a way as reasonably to satisfy the trier of the facts that the accomplice is telling the truth. (*People* v. *Griffin,* 98 Cal.App.2d 1, 26 [219 P.2d 519]; *People* v. *Henderson,* 34 Cal.2d 340, 342-343 [209 P.2d 785].) ■ "Such corroboration must create more than a suspicion of guilt, but is sufficient even though it 'be slight and, when standing by itself, entitled to but little consideration.' " (*People* v. *Trujillo,* 32 Cal.2d 105, 110-111 [194 P.2d 681].) ■ The corroboration may be by direct or circumstantial evidence. (*People* v. *Griffin, supra; People* v. *Henderson, supra.*) ■ The weight of the corroborative evidence is for the trier of the facts to determine. (*People* v. *Trujillo, supra,* p. 112.) ■ The relationship of the parties and all their acts and conduct may be considered in determining whether there are sufficient corroborating circumstances. (*People* v. *Henderson, supra,* p. 343; *People* v. *Willmurth,* 77 Cal.App.

2d 605, 611 [176 P.2d 102]; *People* v. *Ross,* 46 Cal.App.2d 385, 395 [116 P.2d 81].)

▇▇▇▇ The court had, among other things, the following testimony, facts and circumstances for consideration on the question of corroboration. In selling a lot to Miss Anderson, who had already bought a club membership for $615, defendant Nudelman told her they intended to build a health center and were to pipe the mineral water from the other side of the hill to the sanitarium. Two cottages, for each of which she would receive a monthly rental of $200, were to be built on her property. She gave Nudelman her check for $2,325 to cover this transaction. It was endorsed by defendant Frankfort, who also signed her deed. Nudelman stated construction of the sanitarium and cottages would start as soon as the permit came through, and it would not take long for the construction to be completed as they had a gang of men ready to start building. Neither the cottages nor the sanitarium were built. It is a reasonable inference, in view of the manner in which defendants handled the funds collected, that they never intended to build either. Defendants did not have mineral waters to pipe anywhere.

In soliciting one Anspach, who had purchased a club membership for $435, to pay the maintenance fee Nudelman told him the people who were financing the paper on the cottages considered the $360 maintenance fee note a lien on the property, and that it was necessary to pay it before they could consider going ahead with the financing, and if he did not pay up it would be necessary to go to the next one on the list and give them the opportunity to pay theirs, and consequently he would not receive the cottage. Nudelman also explained that the bank official who had originally made the arrangements for financing 50 cottages had been fired and that only 25 cottages would be constructed. Upon that occasion Nudelman delivered to Anspach the gift deed to which he was entitled as a result of his membership purchase. Nudelman, however, asked him not to record it since it was to be turned in to the company in exchange for one covering the property he would select in the rental area near the clubhouse. While Anspach did not pay the maintenance fee the story Nudelman told him was in line with the sales talks defendants gave their salesmen.

After purchasing a charter membership and securing a gift deed Mr. Francois was told by Nudelman that upon the pay-

ment of the $350 maintenance fee he would be taken to Lake Elsinore to pick out a lot upon which a cottage would be built. The corporation would rent the cottage, make the collections, retain a certain amount for cost of construction and pay the balance over to him. He would not have to pay anything further before the cottage was built. No cottage was ever erected for him. In the initial approach to Mr. Francois, who was manager of a substantial concern, it was explained that they needed a few select business and professional people, and he had been chosen as one of such persons, to whom they would give a membership at a very small fee plus land and a cottage for income.

In selling Mrs. Hall a lot for $2,325 Nudelman, among other things, represented that the Spa Corporation was going to have a hot springs at Lake Elsinore and had $1,500,000 to put into it; that they had the water rights; that they almost had the material on the ground to build the cottages; and that construction would start right away. The Spa Corporation would rent the cottages (two on a lot) and collect the rent for her. Her deed was signed by defendant Frankfort. It was not until later that she learned she would be required to advance two-thirds of the cost of construction.

In collecting the maintenance fee of $350 from Mr. Hamner, Nudelman represented to him that the bank refused to finance any construction unless the lot was cleared by paying the maintenance note. He also stated that Spa Corporation owned the hot springs and that a representative of the corporation would call on him to discuss the mineral springs. Shortly thereafter such a representative did call and in an attempt to make another sale on which $500 was paid he represented, among other things, that the Spa Corporation had mineral hot springs over the hill which they were going to pipe to the resort in a glass tubing.

Briefly stated, Nudelman represented to Mr. and Mrs. Hanan that a group of financiers from New York had taken over the property and were operating the Spa Country Club; to Mr. Kaufmann that this group had plenty of money and there was no worry about further finances; to Mr. Harris that they had discovered on the company property a mineral spring well which was capable of producing 100 gallons of water per minute; that the hot springs corporation was planning to build a large hospital; that it was a $2,000,000 enterprise, and the plans called for several different pools of this mineral water at various temperatures for treatment of

arthritis; to Mrs. Peckinpaugh that the Spa Corporation would build and furnish a cottage that went along with her membership and take out $35 per month to apply on construction cost and pay the balance to her; that the $350 maintenance fee was for the upkeep of the cottage and for maid service; that if she paid this fee in advance the corporation would proceed to build the cottage; that they had the contractor engaged.

Nudelman contacted a number of the other victims making various representations to them similar to those herein enumerated. All of these were along the pattern of the sales talks prepared by Frankfort and Nudelman, and which the salesman used, according to the testimony of the victims, as the representations made by them.

While defendant Frankfort appears to have devoted his efforts primarily to the management of the enterprise, including the employment and training of salesmen and the preparation of a great variety of contracts and other documents for the use of the salesmen and his associate defendant Nudelman, he nevertheless had some significant contacts with members and lot purchasers. One of these was Terry. Frankfort told him there were hot springs back in the mountains and that ''the corporation had spent at that time over a million dollars in piping these hot springs down to where they were going to build . . . a bathhouse.'' Frankfort exhibited a pencil sketch which showed the main bath building and then arched around that a group of larger cottages which Frankfort said would be more elaborate than those built at the club. He explained to Terry that the latter could give up his cottage deal at the club and go into the hot springs deal. Terry, however, did not go into the new project, and later, at the request of Nudelman, who told him he was holding up the whole ''shebang'' by his failure to sign a paper releasing his rights (whatever they were), did sign such a release.

In selling membership to Morris it was represented that he was one of six persons who had been selected to fill vacancies in the original charter group of 100 who were required to be landowners, and that a lot went with the transfer of such membership; that a licensed realtor would be around within 10 days to take him and his wife to Lake Elsinore to select his building site. Upon the failure of any realtor to appear Morris went to the Spa Corporation offices and contacted Frankfort. He explained to Frankfort what

he had been told and asked why the realtor had not called to take them to select their location. Frankfort replied that "they were exceptionally busy, very busy, in fact." Morris then wanted to know what he was going to do about the cottage since it was "supposed to be ready by July first." Frankfort told him, "they were ready to go ahead." Morris inquired about authority from the Federal Housing Administration. Frankfort said, "We have that." He explained this was 95 per cent true; that the local office had authorized it and sent it to Washington but this "was only a matter of form," that the construction company was ready and had their machinery available, and that Morris would hear from them in a few days. Later Morris received the "Deed of Gift" and a letter of transmittal, both signed by Frankfort. Nudelman then called on Morris in an effort to collect in advance the maintenance fee and Morris thereupon wrote Frankfort that the deed which he had received was not acceptable, stated the representations upon which he had paid $435 for the membership and signed the maintenance fee note, and demanded performance in accordance therewith. He also referred to his personal visit to see Frankfort and the latter's assurances. Morris did not get either a cottage built or a building site.

Mrs. Hibbs testified that she told Frankfort of the misrepresentations made to her by Nudelman and another salesman and demanded a return of her money. She did not receive it.

Defendant Frankfort argues that what transpired at his conferences with Terry, Morris and Mrs. Hibbs can in nowise serve to connect him with the alleged conspiracy because these people had already parted with their money when they talked to him. The crime had already been committed. The court is not so restricted as to the facts and circumstances which it can consider in passing on the question as to whether a conspiracy has been formed. (*People* v. *Ross,* 46 Cal.App.2d 385, 395 [116 P.2d 81]; *People* v. *Kobey,* 105 Cal.App.2d 548, 556 [234 P.2d 251]; *People* v. *Griffin,* 98 Cal.App.2d 1, 25 [219 P.2d 519].) ▮ All the facts that throw any light on the question are to be considered by the court. The inferences may be very illuminating. Here the court could reasonably infer from these incidents that the sales representations were in accordance with Frankfort's understanding of what they were to be and met his approval.

From the facts, circumstances, and evidence herein recited and referred to, and certainly from the record in its entirety, it is clear that there was ample corroborative evidence of the conspiracy, and that the judgment of the trial court on that count must be sustained.

The grand theft charges are based on the theory of obtaining money by false pretenses. The elements of that offense are: (1) An intent to defraud; (2) an actual fraud committed; (3) the use of false pretenses to perpetrate the fraud; and (4) reliance upon the fraudulent representations in parting with the money or other property. (*People* v. *Harrington*, 92 Cal.App. 245, 254 [267 P. 942]; *People* v. *Alston*, 139 Cal.App. 575, 576 [34 P.2d 759]; *People* v. *Daniels*, 64 Cal.App. 514, 517 [222 P. 387].)

Defendants contend that not all these elements are established. In this, however, they are in error except as to certain counts that will later be discussed. The intent to defraud is a question of fact, to be determined from all the facts and circumstances of the case. (*People* v. *Post*, 76 Cal.App.2d 511, 514 [173 P.2d 48].) It is clear that there is ample evidence in the record to support the court's implied finding of such intent. It is equally clear that the purchaser in each transaction did not get what he bargained for and was actually defrauded. Since, however, defendants contend that the evidence is insufficient to sustain their conviction it is necessary to examine the nature and character of the representations that were made. A great variety of representations were made to the various victims, not all, of course, being made to any one person. Because of the large number of counts it is not practicable to summarize the evidence on each. The following, however, are among the representations that were made, viz., that the Spa Corporation had invested $1,500,000 in the property and had another $1,500,000 to spend on its development; that they had discovered mineral water and hot springs on the property, had spent over $1,000,000 in piping hot water from the springs to where they were going to build a bathhouse, and had put down test wells and could get enough mineral water for at least 2,000 people; that the company had a large sum to put into the clubhouse and grounds, the boat landing and dockhouse; that a big maintenance fund had been established; and that various amounts in the neighborhood of $2,000,000 were to be spent in building a health resort.

Many representations, differing however in detail, were made regarding the building and financing of cottages by the company for those who purchased memberships, and also for those who bought lots. Perhaps the most frequent story was that the free lot, which was given in connection with a membership purchase, could be exchanged for another lot in the rental area near the clubhouse on which the company would build a cottage which would be paid for from the rentals over a certain period of years, after which it would belong to the owner free and clear. The owner, however, would be entitled to have certain use of the property during this period. In some cases the representation was that the owner would immediately receive the rentals,—not that they would first be applied to the cost of the building for any fixed period or at all. To others it was represented that financing was arranged with the Bank of Hemet; that financing had already been provided for the construction of 50 cottages; that the company had $70,000 with which to build 20 cottages; and that the Federal Housing Authority had granted permission for such construction.

The maintenance fee phase of this scheme, insofar as collections were concerned, dealt principally with the statements that the government would not permit the company to build, and the bank would not finance any building, until the maintenance fee was paid, and that this fee had to be paid before construction would start. Without delineating the testimony beyond that to which reference has already been made, it can be said with assurance that there is ample evidence in the record to demonstrate the falsity of the above representations with respect to past or then present asserted facts. Complaint is made, however, that certain of the representations were of a promissory character. ▇ This is true but such promises, if unconditional and made without intention of performance, may constitute actionable fraud. (*People* v. *Mason*, 86 Cal.App.2d 445, 449 [195 P.2d 60]; *People* v. *Chamberlain*, 96 Cal.App.2d 178, 182 [214 P.2d 600].) ▇ Whether a promise was dishonestly made is a question of fact for the trial court's determination upon all the evidence. (*People* v. *Ames*, 61 Cal.App.2d 522, 532 [143 P.2d 92]; *People* v. *Gordon, supra,* p. 624.) The failure to build the sanitarium and the promised cottages, and the use the defendants made of the money that was collected justified the inference that the promises were fraudulently made.

On the question of reliance, most of the victims gave specific testimony that they relied on the representations made to them in signing the contracts and maintenance notes, and in parting with their money. There were, however, several victims of whom such inquiry was not made. Defendants insist that this omission is fatal to their conviction on such counts. ██ This is not true. ". . . the express testimony of a victim of false pretense that he was induced to part with his money by the fraudulent statements of the accused is not essential. It is sufficient if the inference of his reliance could have been drawn from all the evidence." (*People* v. *Gordon, supra*; *People* v. *Schmidt,* 79 Cal.App. 413, 418 [249 P. 832, 250 P. 1104].) It is clear that the trial court was justified in drawing such inferences. However, the conviction on counts 11 and 12, which reflect the transactions with Mr. Dally, must be reversed because he testified that he did not part with his initial payment of $365 in reliance upon the representations made to him. No new representations were made at the time of his subsequent payment of $500. A necessary element of the offense charged in those counts was thus absent.

It is contended that the testimony of the salesmen and club members was hearsay as to statements made out of the presence of the defendants, and as such was inadmissible on the individual counts to which it related. ██ This contention, however, overlooks the principle that upon the existence of the conspiracy having been shown, the acts of each coconspirator in pursuance thereof is attributable to all the others even though they were not personally present when such acts were committed. (*People* v. *Ash,* 88 Cal. App.2d 819, 828 [199 P.2d 711] ; *People* v. *Benenato,* 77 Cal. App.2d 350, 358 [175 P.2d 296].) The conspiracy need not be established beyond a reasonable doubt before such evidence is admissible; a prima facie showing of such fact is all that is required. (*People* v. *Steccone, supra,* p. 238.) Here all the salesmen who were a part of this fraudulent scheme were coconspirators. Therefore this evidence was admissible. (*People* v. *Sica,* 112 Cal.App.2d 574, 584 [247 P.2d 72].)

Defendants challenge the testimony of the victims as being inherently improbable. In support of this contention they point to inconsistencies and conflicts in the testimony of particular witnesses and the asserted fact that the contracts

and other documents were either read by them or read to them by the salesmen. ▇ The fact that there are inconsistencies and conflicts in the testimony of a witness does not bring it within the rule of inherent improbability. (8 Cal.Jur., § 582, p. 591.) ▇ Conflicts and inconsistencies in the testimony of an individual witness are to be resolved by the trier of facts. (*Peterson* v. *Peterson,* 74 Cal. App.2d 312, 319 [168 P.2d 474]; *Hansen* v. *Bear Film Co.,* 28 Cal.2d 154, 184 [168 P.2d 946].) ▇ To come within the rule of inherent improbability the testimony must be such that it is physically impossible for it to be true, or its falsity must be apparent without resort to inference or deduction. (*People* v. *Lindsey,* 90 Cal.App.2d 558, 563 [203 P.2d 572]; *People* v. *Klinkenberg,* 90 Cal.App.2d 608, 627 [204 P.2d 47, 613].) ▇ The fact that the documents were read would not make it inherently improbable that other, different and additional representations were made by the salesmen.

Defendants insist these contracts insulate them from this prosecution because they contain the statement that they constitute the entire agreement between the parties, that the Spa Corporation is not bound by any representations outside the contract, that no salesman is authorized to make any additional or contrary representations, and that the club member has read and understands what he is signing. ▇ The simple answer to this argument is that "The People prosecuting for a crime committed in relation to a contract are not parties to the contract and are not bound by it. They are at liberty in such a prosecution to show the true nature of the transaction." (*People* v. *Chait,* 69 Cal.App.2d 503, 519 [159 P.2d 445]; *People* v. *McEntyre,* 32 Cal.App.2d Supp. 752, 760 [84 P.2d 560]; *People* v. *Jones,* 61 Cal.App.2d 608, 620 [143 P.2d 726]; *People* v. *Pierce, supra,* p. 605.) The practical wisdom of the rule is illustrated in this case. Upon at least three occasions prospective purchasers complained to defendant Nudelman that the written agreement did not seem to conform to what they had been told, whereupon he assured each party, in effect, that everything would be taken care of and he need not worry. ▇ It was stipulated that the testimony of a number of witnesses given at the preliminary hearing might be read at this trial subject to the right of any desired additional cross-examination. Defendants had the right to thus waive confrontation by these witnesses. (*People* v. *Wallin,* 34 Cal.

2d 777 [215 P.2d 1].) ▮ Defendants now, however, insist that this court should reexamine the credibility, weight and intrinsic value of such testimony. When they made this arrangement they knew what the testimony of these witnesses was, had cross-examined them, and had observed their demeanor on the witness stand. They apparently then thought it was not important for the trial judge to see and hear them in order to evaluate their testimony. Being displeased with the result does not give them the right to shift to this court a responsibility which unequivocally belongs to the trial court. (*People* v. *Smith*, 39 Cal.App.2d 154, 157 [102 P.2d 550] ; *People* v. *Newland, supra*; *Chuchian* v. *Metropolitan Life Ins. Co.*, 103 Cal.App.2d 760, 762 [230 P.2d 381].) This proposal illustrates the basic difficulty with defendants' argument throughout this case. They would have us reweigh the evidence and draw inferences contrary to those drawn by the trial court. We are not authorized to do this under well recognized legal principles. (*People* v. *Gould*, 111 Cal.App.2d 1, 8 [243 P.2d 809].) It is the pursuit of this unauthorized approach to a consideration of the evidence that leads defendants to their erroneous conclusion that the judgment against them is the result of what they call guilt by association. When, however, the evidence is viewed, as it must be on appeal, in the light most favorable to the successful party in the trial court (*Estate of Isenberg*, 63 Cal.App.2d 214, 216 [146 P.2d 424]), it supports the conclusion that their conviction was based on their own planning of and participation in fraudulent business transactions.

▮ Defendants cite section 1110 Penal Code and argue that the testimony of the respective victims covering the false representations made was not corroborated. The rule is that in this class of cases the circumstances connected with the transaction, the entire conduct of the defendant, and his declarations to other persons are proper matters for the consideration of the jury, and may be looked to to furnish the corroborative evidence contemplated by the law. (*People* v. *Wymer*, 53 Cal.App. 204, 206 [199 P. 815] ; *People* v. *Whiteside*, 58 Cal.App. 33, 41 [208 P. 132] ; *People* v. *Helmlinger*, 69 Cal.App. 139, 142 [230 P. 675].) As pointed out in *People* v. *Chait, supra*, page 516, the testimony of all the purchasers may be taken into consideration for this purpose. This testimony, which shows the use of a uniform plan

and pattern and very similar statements of the false pretenses, together with the conduct of the defendants, was sufficient.

Defendant Nudelman asserts that 31 of the counts, based on two separate payments of over $200 each made by 14 of the victims and three such payments made by one other victim, should have been telescoped into 15 counts, since the particular payments made by each of the parties were in pursuance of a single transaction and thus could not constitute more than one offense. ■ "The question of whether a series of wrongful acts constitutes a single or multiple offense must in the last analysis be determined by the peculiar facts and circumstances of each individual case." (*People* v. *Stanford,* 16 Cal.2d 247, 251 [105 P.2d 969].)

■ In cases of theft involving the obtaining of money or property by false pretenses, where property of different value or character is taken at various times though upon the same false representations, the rule is established that a separate crime is consummated upon each distinct appropriation of money or property obtained under the influence of the fraudulent misrepresentations. (*People* v. *Howes,* 99 Cal.App.2d 808, 818 [222 P.2d 969] ; *People* v. *Miles,* 37 Cal.App.2d 373, 378-379 [99 P.2d 551] ; *People* v. *Ellison,* 26 Cal.App.2d 496 [79 P.2d 732].) The evidence clearly shows that the defendants obtained possession of the several sums of money referred to in each of the counts under consideration at different times but on the continuing strength of the representations originally made; in such circumstances, the court was justified in treating each receipt and appropriation of money as a distinct offense. (*People* v. *Howes, supra*; *People* v. *Stanford, supra.*)

■ Defendants argue that if the doctrine followed in the above cases is applicable to the circumstances of this case, then this court must reverse the convictions based on seven of the counts, in each of which they complain that several payments of less than $200 by a particular victim were aggregated in order to constitute one count of grand theft. They argue that this procedure can only be based on the theory that the successive payments were part of one overall transaction based on a single felonious impulse, which is inconsistent with the view taken in the cases last cited. However, an examination of the counts referred to indicates that there is no merit in this argument. In each of these transactions, the victim made a down payment, and

then signed either a promissory note for an amount in excess of $200 or a contract under which the victim obligated himself to pay such amount. While it is true that subsequent payments, each less than $200, were made to discharge the debts evidenced by the promissory notes and contractual obligations nevertheless the offenses which form the basis for these counts were already completed when the promissory notes and written obligations to pay were obtained by the use of false representations. (*People* v. *Hand,* 127 Cal. App. 484, 487 [16 P.2d 156].) The promissory note itself is property within the meaning of section 484 of the Penal Code. (*People* v. *Cassou,* 27 Cal.App. 23, 25 [148 P. 810].)

Section 7 of the Penal Code provides that "the word 'property' includes both real and personal property" (subd. 10), and "the words 'personal property' include money . . . things in action, and evidences of debt." (Subd. 12.) "A thing in action is a right to recover money . . . by a judicial proceeding." (Civ. Code, § 953.) The Civil Code defines property as "a thing of which there may be ownership" (§ 654) and states there may be ownership "of all obligations." (§ 655.) An obligation is a legal duty by which a person may be bound to do a certain thing, and it may arise from a contract. (Civ. Code, §§ 1427, 1428.) "If the thing stolen consists of any evidence of debt, or other written instrument, the amount of money due thereupon . . . or which in any contingency might be collected thereon . . . , is the value of the thing stolen." (Pen. Code, § 492.) It is thus apparent that when it was shown that the victims signed promissory notes and contracts obligating themselves to pay sums in excess of $200, they parted with property. (Pen. Code, § 7, subds. 10, 12; § 484.) "The evidence therefore as a matter of law supports the conviction of *grand* theft." (*People* v. *Leach,* 106 Cal.App. 442, 456 [290 P. 131, 137].)

Defendant Nudelman insists that the judgment based on the 15 counts involving collection of the maintenance fee notes cannot be sustained because a person cannot be defrauded of money which he owes under a valid obligation, and that if a crime was committed it was committed when the club member signed the promissory note as part of the transaction by which he purchased his membership contract. There appears to be merit in this position because it was at the time of the sale of the membership that the representations were made that the maintenance fee was to be

used for the care and maintenance of the cottages and grounds. This representation was false because no cottages were built and no maintenance fund was ever established. But defendants cannot escape on this ground for when one has knowingly and designedly, by fraudulent representations, defrauded another, such representation shall be treated as continuing so as to cover any money, property or services received as a result thereof. (Pen. Code, § 484; *People* v. *Caldwell*, 55 Cal.App.2d 238, 251 [130 P.2d 495]; *People* v. *Rabe*, 202 Cal. 409, 413 [261 P. 303].) The fact that the salesmen later told some of these members when the collections were actually made that the note constituted a lien on their property or that a discount was offered for prepayment of these notes does not alter the situation. These later representations were made as an aid to the accomplishment of the main purpose. Under this principle of the continuing character of the false representations the conviction on a count involving collection of such fee would have to be sustained even though no new inducing representations were made. Nor may defendants escape conviction on such collections on these counts where the victims made some investigation or consulted an attorney before payment was made. The discovery of such fraud is not always simple. This is particularly true when a portion of it deals with fraudulent provisions to build a health resort, as here. The trial court may well have concluded that the particular victim had not discovered the fraud when he made the payment or consulted his attorney.

Defendant Nudelman argues that the six counts covering the transactions with Mr. and Mrs. Wood, and the count involving the Hanan deal must be reversed because the husbands only are named in the information while the respective wives either made the payments or made most of them and testified as to their reliance on the representations. The husbands did not testify. Therefore it is claimed there is no showing of reliance on the part of the person alleged to have been defrauded. The evidence shows that both the husbands and wives were present when the representations were made. The transactions covered by these counts were apparently the only ones with these two families. The defendants were therefore undoubtedly sufficiently informed to present any defense they had. They could not have been misled or placed at any disadvantage by reason of the husbands, instead of the wives, being named in the in-

formation. The variance was therefore immaterial. (Pen. Code, § 956; *People* v. *Silverman,* 33 Cal.App.2d 1, 4 [92 P.2d 507].)

Defendant Nudleman lists ten counts which he argues must be reversed because the person named in the information paid no money to the Spa Corporation or any of its salesmen. In these counts the evidence shows that the money was actually delivered by some member of the family. In one instance the money was paid by the victim's father while the former was out of the city; in other cases the money was handed over either by the husband or wife. Because of the circumstances and particularly because of the relationship, the trial court was entitled to infer that the person who delivered the money was acting as the agent of the victim and made the delivery pursuant to arrangements with the latter. The record reveals false representations were made to these witnesses and that they relied upon them. The Spa Corporation issued its usual routine of documents in such transactions, so the money reached it. The members of the family who delivered the money were virtually acting as messengers. The pleading sufficiently identified the respective charges so defendants could not have been prejudiced in making their defense. The variance was therefore unimportant. (Pen. Code, § 956; *People* v. *Woodson,* 11 Cal.App.2d 604, 606 [54 P.2d 33].)

Defendant Nudelman points to five counts in which the club members purchased their memberships from salesmen who were not named as coconspirators in the information. Three of the salesmen did not testify at the trial; one of them did. Victims were permitted to testify over the objections of defendants as to the representations made by them. It is urged that this was error. We think not.

"A principal, in order to be held criminally liable, must be shown to have knowingly and intentionally aided, advised, or encouraged the. criminal act committed by the agent." (*People* v. *Doble,* 203 Cal. 510, 515 [265 P. 184].)

Bearing in mind that the defendants employed and trained all salesmen; that these men were selling club memberships; that they made substantially the same representations as were made by other salesmen who were named as coconspirators; that one of them assisted, at the request of defendant Frankfort, in the training of at least one salesman; that another went on sales solicitations with a salesman who

was named as a coconspirator; that the defendant corporation, through Frankfort, issued a gift deed to a member as the result of the solicitations of the third salesman, who did not testify at the trial; that the fourth of these salesmen—the one who did testify—was hired by Frankfort and trained by Nudelman and made the same character of misrepresentations that other coconspirators made, justified the trial court in drawing the inference that the four salesmen were acting as the instrumentalities of the defendants in making these solicitations and misrepresentations in furtherance of the preconceived plan and scheme of the defendants. (*People* v. *Keller,* 79 Cal.App. 612, 617 [250 P. 585].) The activities of these salesmen were an important part of the general conspiracy (*People* v. *Chait, supra,* p. 520), and the statements they made were, under the circumstances, attributable to the defendants, and the challenged evidence was properly admitted.

The complaint of defendant Frankfort that the verdict of the trial judge went against him because the latter does not believe in high pressure selling and that he believed defendants were engaged in such practice, the charge by defendant Nudelman that the trial court was guilty of misconduct and prejudice, and the intimation that the verdict was influenced by matters outside of the record, are wholly without merit. Just before deciding the case the judge stated that he had "listened carefully to all of the evidence with a desire of seeking out the truth," and had "read and reread much of it;" that the briefs had been of "great assistance" to the court and much time had been spent in reading them as well as in independent research. The judge then said: "Taking all the facts into consideration, it is impossible to arrive at any other conclusion than that the defendants conceived, developed and put into operation this plan to obtain the money of the so-called 'members' by false and fraudulent representations." This summation belies these charges. Many of the items about which complaint is made relate to procedural matters and rulings such as normally arise during the course of an extended criminal trial. Our examination of the record discloses that the judge conducted this trial in a thoroughly objective manner and with due regard for the rights of all parties.

In support of his motion for a new trial Frankfort filed an affidavit stating that his trial attorney had advised him from the inception of this project in every move he had made, approved all legal documents, the method and plan

of sale, and had advised him that his entire course of conduct was legal; that during the course of the trial he had requested his attorney to permit him to testify to such facts but was advised by his counsel that such evidence had no bearing on the issues. Frankfort further states he has since been told by other counsel that such evidence was proper and should have been presented. He now contends that this latter advice places such facts in the class of newly discovered evidence and entitled him to a new trial. In this he is in error. It is obvious that the facts were known to both defendant and his counsel. It is therefore not the facts but their materiality which is claimed to have been newly discovered. Where it is not even claimed counsel acted in bad faith, such discovery does not entitle a defendant to a new trial. (*People* v. *English,* 68 Cal.App.2d 670, 673 [157 P.2d 429] ; *People* v. *Kelly,* 32 Cal.App.2d 624, 627 [90 P.2d 605] ; *People* v. *Urquidas,* 96 Cal. 239, 242 [31 P. 52].)

 Frankfort emphasizes that one of the salesmen who testified that he got his sales talk from Frankfort later denied this at a hearing before a state board. Affidavits also attack the truthfulness of the testimony given by other witnesses. Such showing, however, did not require the granting of the motion for a new trial. (*People* v. *Tallmadge,* 114 Cal. 427, 430 [46 P. 282] ; *People* v. *Lee,* 9 Cal.App.2d 99, 106 [48 P.2d 1003] ; *People* v. *Poor,* 52 Cal.App.2d 241, 243 [126 P.2d 146].)

 Finally, it is fundamental that in ruling on such a motion the trial court has a large discretion and that its ruling will not be disturbed on appeal unless there is a clear abuse thereof. (*People* v. *Coronado,* 57 Cal.App.2d 805, 815 [135 P.2d 647] ; *People* v. *Mandell,* 48 Cal.App.2d 806, 818 [120 P.2d 921].) We find no abuse of discretion.

Our examination of this record impels us to observe that neither the results in this case nor the administration of justice generally justifies filing so many counts in this class of cases.[1] Here the sentence runs concurrently on all the counts. This result could have been achieved upon a successful prosecution on a relatively few counts. Because so many counts were involved the expense of this case has been quite excessive both to the People and the defendants, the admin-

---

[1]The present district attorney of Los Angeles County was not in office when this case was tried.

istration of justice has been unreasonably delayed,[2] and the criminal courts unnecessarily congested thus interfering with the normal disposition of other matters. The public is entitled to expect and the procedural sections of the criminal code provide for the expeditious handling of criminal proceedings. The proper administration of justice requires that this be done, and that it be accomplished without unnecessary expense. These results can be achieved by a practical consideration of the number of counts that are to be included in the information.

The judgment and the order denying the motion for a new trial are reversed as to counts 11 and 12; they are affirmed as to the remaining 67 counts.

Moore, P. J., and McComb, J., concurred.

---

[2]The trial of this case started on June 19, 1950. The record on appeal was filed on June 4, 1951. Principally because of the large number of counts, it was necessary to grant counsel for defendants three months' additional time in which to prepare their opening brief, the People six months, and defendants five months for their reply. The final brief was filed in this court on October 17, 1952. The case was on the calendar and submitted on October 22, 1952.